**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT NASHVILLE**

**APRIL SESSION, 1999**

FILED

June 30, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| CLAUDE FRANCIS GARRETT, | ) | C.C.A. NO. 01C01-9807-CR-00294 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| | ) | DAVIDSON COUNTY |
| VS. | ) | |
| | ) | HON. SETH NORMAN |
| STATE OF TENNESSEE, | ) | JUDGE |
| | ) | |
| Appellee. | ) | (Post-Conviction) |


**ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF DAVIDSON COUNTY**


FOR THE APPELLANT:

DWIGHT E. SCOTT
4024 Colorado Avenue
Nashville, TN 37209

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

ELIZABETH T. RYAN
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

VICTOR S. JOHNSON
District Attorney General

JOHN ZIMMERMANN
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN 37201-1649


OPINION FILED _____

REVERSED AND REMANDED

DAVID H. WELLES, JUDGE

# **OPINION**

In 1993 the Defendant, Claude Francis Garrett, was convicted of felony murder and sentenced to life imprisonment. On direct appeal to this Court, his conviction was affirmed,[1] and the Tennessee Supreme Court denied the Defendant's application for permission to appeal. The Defendant subsequently filed a petition for post-conviction relief, which was later amended after appointment of counsel. The trial court denied relief on July 15, 1998. Pursuant to Tennessee Code Annotated § 40-30-216 and Rule 3(b) of the Tennessee Rules of Appellate Procedure, the Defendant now appeals as of right the trial court's denial of post-conviction relief. We reverse the order of the trial court and remand for findings of fact and conclusions of law as mandated by statute.

The Defendant presents four issues for our review: (1) whether the State withheld exculpatory evidence from the defense; (2) whether the Defendant received ineffective assistance of counsel at trial; (3) whether jury misconduct and bias resulted in a violation of the Defendant's constitutional rights; and (4) whether the jury instruction given at trial on "unreasonable doubt" was unconstitutional.

## BACKGROUND

For a complete understanding of the issues involved in this case, we find it necessary to summarize the events underlying the Defendant's conviction. The following recitation of facts was compiled from the opinion of this Court on direct

---

[1] State v. Claude Francis Garrett, No. 01C01-9403-CR-00081, 1996 WL 38105 (Tenn. Crim. App., Nashville, Feb. 1, 1996).

appeal from the Defendant's conviction. See State v. Claude Francis Garrett, No. 01C01-9403-CR-00081, 1996 WL 38105 (Tenn. Crim. App., Nashville, Feb. 1, 1996).

The victim in this case, Lorie Lance, died on February 24, 1992 from smoke inhalation in a fire that consumed the residence she shared with the Defendant. When firefighters arrived at the scene, the Defendant reported to them that he had escaped the flames but that the victim was still inside. He told them he had last seen the victim run toward the back of the house. Firefighters found her lying unconscious on the floor of the utility room in the rear of the home. Although the room contained a door which led outside, according to testimony of police officers at trial, the door was locked from the outside of the home, and the windows in the room were boarded. The victim was found wedged between the washer and dryer and the wall. Despite efforts to revive the victim, she never regained consciousness. The Defendant suffered severe burns to his left arm and face, and his facial hair was singed in the fire.

An investigation revealed that arson was likely the cause of the fire. Traces of kerosene were found on the living room floor where the blaze arose, a kerosene-soaked bedspread was found in front of the refrigerator, and a five-gallon plastic container filled with kerosene was discovered between the kitchen and utility room. In addition, a smoke detector from which the battery had been removed was found on the dryer in the utility room. The investigation also revealed that the door to the utility room inside the home was closed during the fire. The Defendant's clothing tested negative for accelerant. An autopsy

revealed that the victim had a blood alcohol level of .06 percent at the time of her death.

A neighbor testified at trial that he observed the Defendant stooping next to a tree during the blaze. He stated that when he crossed the road to help, the Defendant picked up a chair, began to break the windows of the residence, and began to call the victim's name. The neighbor described the Defendant's demeanor on the night of the fire as "sort of cold." One firefighter testified that when he was unable to locate the victim, the Defendant told him, "I know where she's at, if you'll go straight through the back of the house she's through a back door, the door in the back of the house by the kitchen."

A police detective testified that the Defendant appeared to be nervous immediately after the fire. He stated that the Defendant asked whether he was under arrest, although he had not yet been accused of starting the fire. He also pointed out that in statements to police, the Defendant presented two different versions of what happened on the night of the fire. However, firefighters who testified for the defense stated that they had to restrain the Defendant, who appeared to be intoxicated, from re-entering his home on the night of the fire. One testified that the Defendant was beating on the door of the fire truck and frantically telling the firefighters that the victim was in the bedroom.

When police decided to press charges against the Defendant, they were unable to find him. They eventually located him in Hiawatha, Kansas. The Defendant explained that he had gone there to stay with his mother and claimed that several people knew how to reach him.

-4-

The Defendant testified that he and the victim had been involved in a relationship for one and a half years and planned to be married. He testified that on the night of the fire, he and the victim had visited a local bar for several hours. He stated that they returned to their residence, watched television, and fell asleep on the couch before getting into bed. The Defendant reported that he awoke to the fire, arose, walked to the bedroom door, and called to the victim. He stated that she grabbed his arm but then pulled away and walked toward the back of the house.

The Defendant explained that the door to the utility room was not locked, but merely hard to open. He also stated that kerosene was stored in the house for use in a kerosene heater, and he maintained that he had spilled some kerosene on more than one occasion while filling the heater. Furthermore, he claimed that the smoke detector had been taken down while the kitchen was being painted and that it was inoperable because the victim forgot to buy batteries for it. Finally, he suggested a couple of potential suspects who he believed may have started the fire.

Other witnesses at trial described a tumultuous relationship between the Defendant and the victim. The victim's supervisor at Uno's Pizzeria, where she worked at the time of her death, testified that the victim once came to work with a black eye and marks on her leg and lower back. Another witness testified that the victim once claimed to have received bruises at the hands of the Defendant. A waitress from the bar that the victim and the Defendant visited on the night of the fire testified that although the victim and the Defendant had not fought that evening, the victim appeared to be fearful of the Defendant. The Defendant

admitted that he had "beaten" the victim on three prior occasions. He also admitted that he had previously been convicted of grand theft, two burglaries, and a jail escape.

## POST-CONVICTION PROCEEDING

At the post-conviction hearing, Detective David Miller, the lead investigator for the case, testified about a report which he wrote during the investigation. In the report, he stated,

> Have contacted Captain Jenkins about the position of the victim's body when located in utility room. According to Captain Jenkins, the victim was lying parallel to the outside wall, with her head laying closest to the corner near the washer and dryer. <u>As best as Captain Jenkins remembers to us, the door to the storage-utility room, the door was not locked.</u>

(Emphasis added). At the hearing, Miller claimed to remember "having the initial conversation" but could not remember any specifics of the conversation aside from what he had included in his report. He stated that after he wrote the report, he forwarded it to the district attorney's office. It appears from the record that this report was not disclosed to defense counsel, although we emphasize that there are no findings of fact in the record.

Miller also testified about a toxicology report which contained the results of a blood alcohol test performed on the Defendant shortly after the fire. The test results revealed that the Defendant had a blood alcohol level of 0.11 percent on the night of the fire. Miller stated that a copy of the toxicology report "should have been" forwarded to the district attorney's office along with all other reports in the case.

Captain Otis Jenkins of the Metro Fire Department next took the stand at the post-conviction hearing. Jenkins testified that he responded to the fire on February 24, 1992 and was likely the first person to discover the victim's body in the utility room. Contrary to the statement attributed to him in Detective Miller's report, Captain Jenkins stated that the outside door to the utility room was locked when he arrived. He reported that he testified at trial that the door was locked and unequivocally maintained that he could not possibly have been mistaken about this fact. He stated that he had no memory of ever indicating to Detective Miller that the door was unlocked.

Greg Galloway, the Defendant's attorney at trial, also took the stand at the post-conviction hearing. He stated that he had been an attorney for twenty-three years and testified that he believed this case may have been his first murder trial. He stated that he worked on the case for approximately a year before the trial, devoting "at least 150 hours" to the case. Galloway estimated that he spoke with the Defendant approximately six times in person and on the phone on other occasions. He testified that he and the Defendant discussed the State's written response to their discovery request. He further testified that the Defendant sent him several letters which included witnesses the Defendant believed should be called to testify at trial. He recalled that he and the Defendant discussed the witnesses and settled on approximately eight witnesses to be subpoenaed for trial.

Galloway stated that he spoke with Detective Miller primarily over the phone prior to trial and that they discussed whether the door to the utility room was locked or unlocked. He stated that Miller "said that as far as his investigation

revealed, that the door was not locked." In addition, Galloway testified that he attempted to speak with Captain Jenkins and other firefighters present at the scene of the fire. He maintained that he left messages for them by phone which were never returned.

Furthermore, Galloway testified that he sent a discovery request to the assistant district attorney general handling the case but stated that he did not file a copy of the letter with the court. Among the documents provided him by the State was a diagram of the house which did not include any indication that a bedspread was found in front of the refrigerator. He stated that it was a "complete surprise to [him] when . . . one of the firemen testified that there was a blanket or something in front of the refrigerator." Galloway testified that as a result of his surprise, he did not cross-examine the witness concerning the diagram because "[i]t didn't occur to [him] that [the blanket] wasn't on the diagram at that point and time." However, he also admitted that an evidence log which was turned over to him during the discovery process listed as one of the items recovered from the scene "[b]ed material, bedspread . . . found at the base of the refrigerator." Galloway pointed out that the evidence log did not mention that the bedspread had been soaked in kerosene.

Galloway testified that before trial, he spoke with Assistant District Attorney General Zimmerman, who prosecuted the case, and stated that Zimmerman "led [him] to believe that he had no information indicating the door was locked." He recalled that he did not prepare a defense to counteract evidence indicating the door was locked. He reported that had he known the State would introduce

-8-

evidence at trial that the door was locked, he would have "tried to counteract that some way, or find the reason if it was locked."

Next, Galloway conceded that as a result of an "oversight," he failed to request "Jencks Act material" after Detective Miller's testimony at trial. He stated that he therefore had no access, either before or during the trial, to Miller's report in which Miller claimed Captain Jenkins remembered that the outside utility room door was not locked.

In addition, Galloway described an incident at trial involving a violation of the court's sequestration order. Apparently, a relative of the victim was relating trial testimony to potential witnesses in the hallway outside the courtroom during the trial, and for this reason, the trial judge had the person taken into custody. Galloway stated that he did not move for a mistrial, explaining, "I just knew that he was talking to potential witnesses, I didn't know what he said, so I really didn't know if it was serious enough to ask for a mistrial, so I didn't." He also admitted that he failed to make an offer of proof concerning the violation because he "didn't think about it."

Finally, Galloway stated that he was not provided a copy of the toxicology report containing the results of the Defendant's blood alcohol tests, which indicated that the Defendant had a blood alcohol level of .11 percent on the night of the fire. He testified that had he had access to the report before trial, he would have brought this fact to the attention of the jury and used the test results to help explain some of the Defendant's behavior on the night of the fire. He stated, "[H]e was apparently kneeling or hiding under a tree and not doing anything

about the fire, or . . . he had no reaction to the fire; he had low affect or he wasn't upset enough and that could explain it, him being drunk." However, he did concede on cross-examination that the Defendant told him before trial that he was drinking on the night of the fire, and Galloway admitted that he did present this information to the jury.

Assistant District Attorney General John Zimmerman next took the stand. He testified that two diagrams of the residence shared by the Defendant and the victim were provided to the defense. He stated that neither depicted a bedspread in front of the refrigerator, but he also pointed out another document provided to defense during discovery which contained the following language:

> In reviewing the enclosed sketch submitted by Fire Investigator Kenneth Porter, of the crime scene located 1114 Broadway in Old Hickory, Tennessee, we find several discrepancies . . . in this sketch that we feel needs [sic] to be corrected or discussed before placing this document into the homicide case file. . . . Item Number 6. The bedspread lying in . . . the kitchen in front of the refrigerator which was soaked with kerosene is not depicted in the sketch.

He also maintained that the bedspread, which smelled very strongly of an accelerant, was shown to Galloway in the property room before trial.

Zimmerman testified that the toxicology report containing the Defendant's blood alcohol level never reached him. He stated that the report reached his office but that the clerk for his office merely filed the report rather than sending it on. He also testified that he interviewed Captain Jenkins before trial and specifically questioned him about the door to the utility room. He testified that Captain Jenkins denied ever making a statement to Miller that the door was unlocked. According to Zimmerman, when confronted about the statement contained in Miller's report, Jenkins responded, "Well, [Miller's] wrong, I never

said that." Zimmerman maintained that Jenkins' "memory was extremely clear, because he's the one who unlatched the door." Zimmerman testified that he did not consider the statement to be "exculpatory information" because the information was incorrect. He stated, "I felt like Detective Miller's recollection was vague, he could not specifically remember the conversation he had with Captain Jenkins, and all he knew is what he had recorded in his report, which was equivocal, at best, and Jenkins was absolutely clear on it."

The Defendant was last to testify at the post-conviction hearing. He reported that during the time he was out on bond awaiting trial, a period of nearly a year, he did not once converse with Galloway in preparation for trial. In addition, he stated, "We spoke on the phone a couple of times about some of the evidence, but we never sat down and discussed any defense, no[t] at all." He claimed that although Galloway gave him "some papers," he "never saw a response to a discovery," nor did they discuss the State's evidence against him. He stated that he met with Galloway only three times before trial. He testified, "We had phone conversations and I would just ask him what was going on and he'd say, 'Nothing.' And tell me when the next court date was." Furthermore, he testified that he and Galloway never thoroughly discussed the events that occurred on the night of the fire, prior to the victim's death. He stated that he and Galloway spent only three or four hours "in personal contact" preparing for trial.

## RULING OF TRIAL COURT

At the conclusion of the evidentiary hearing, the post-conviction court made no oral findings of fact or conclusions of law, and simply stated, "Petition is denied." The record on appeal contains no judgment or order of the trial court

denying relief or dismissing the petition. The record does contain a copy of the minutes of the court, reflecting, "Thereupon, this cause came on to be heard by the court on petition for post-conviction relief; after due consideration and all the evidence introduced, said petition is denied."

## ANALYSIS

Without reaching the merits of this proceeding, we must remand this cause to the trial court for entry of a final order and for findings of fact and conclusions of law regarding each ground presented in the petition.

The Post-Conviction Procedure Act adopted by our legislature requires,

> Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each such ground.

Tenn. Code Ann. § 40-30-211(b) (emphasis added).

The statute is clear and unambiguous. Although the reasons for the statutory mandate seem apparent, this Court has noted that,

> [t]he duty to enter findings of fact and conclusions of law as to each ground alleged is mandatory as the appellate courts may only review the findings of the trial court. Not only do the trial court's findings facilitate appellate review, but, in many cases, are necessary for such review.

Ronald Bradford Waller v. State, No. 03C01-9702-CR-00054, 1998 WL 743654, at *6 (Tenn. Crim. App., Knoxville, Oct. 15, 1998) (citation omitted); see also Steve E. Todd v. State, No. 01C01-9612-CR-00503, 1999 WL 30678 (Tenn. Crim. App., Nashville, Jan. 26, 1999); Joe L. Utley v. State, No. 01C01-9709-CR-00428, 1998 WL 846577 (Tenn. Crim. App., Nashville, Dec. 8, 1998).

This case is remanded for the purpose of permitting the trial court to enter its findings of facts and conclusions of law as to each ground alleged in the Defendant's petition. No further proof should be necessary. Once the trial court enters its order, the Defendant may again appeal as of right, if he so desires.

Accordingly, the ruling of the trial court is reversed, and this case is remanded in order to permit the trial court to revisit the grounds raised by the Defendant in his original petition and, thereafter, enter findings of fact and conclusions of law as required by the Post-Conviction Act.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE

_____
JAMES CURWOOD WITT, JR., JUDGE